UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

    Plaintiff,

v.                                                                      Case No. 04-C-875

SCHNEIDER NATIONAL, INC.,

    Defendant.

---

**DECISION AND ORDER**

---

In this Americans with Disabilities Act case, the EEOC claims defendant Schneider National, a trucking company, discriminated against its employee, Jerome Hoefner, when it fired him after what the EEOC describes as a single fainting episode. Schneider claims it was not violating the ADA, but merely enforcing its safety standards and protecting Hoefner and the public from the potential that he might faint again while driving a truck carrying 80,000 pounds of cargo. It also states it never believed Hoefner was "disabled" under the ADA. Both parties have filed motions for summary judgment. For the reasons stated herein, Schneider's motion will be granted and the EEOC's motion denied.

**I. Background**

The facts in this case are largely undisputed. In 2000, a Schneider driver drove off a bridge and died as a result. The driver had been diagnosed with neurocardiogenic syncope, although the cause of the accident was undetermined. Nevertheless, the company instituted a policy that

automatically disqualified from driving anyone diagnosed with neurocardiogenic syncope. The policy reads as follows:

### SYNCOPE

If reason for syncopal episode cause is diagnosed and treated, driver may be eligible to return to work after cleared by physician, receipt of medical records to support this and DOT certification.

If reason for syncopal episode is unknown driver must have the following:

1. Cardiac Evaluation, testing ordered by cardiologist, sni rtw [sic] slip from a cardiac standpoint.
2. Neural Evaluation, testing ordered by neurologist, sni rtw [sic] slip; from neurological standpoint
3. Negative tilt table report

The following are automatic disqualifying diagnosis for Schneider National:

1. Vaso-vagal syncope
2. Neurocardiogenic syncope
3. Pertussive syncope

This needs to be informed to driver & STL via telephone conversation and written follow up sent to the driver (Form letter: H:sar/hr/occhealth/team/syncope driver- filled in appropriately) A carbon copy of letter needs to be placed in the paper file. If the cause of the syncope after evaluation by a cardiologist and neurologist remains unknown and testing performed is all negative the case will be reviewed by Occupational Health. If Occupational Health determines that the circumstances of the case could pose a threat to the driver & motoring public, Occupational Health will consult with Loss Prevention Dept to make determination on [driver's] ability to return to work as an over-the-road truck driver with SNI.

(Def. PFOF ¶ 34.)

Between 1989 and 2002, Jerome Hoefner had safely driven more than one million miles over the road (OTR) in Schneider trucks. In October 2002 Hoefner attended his son's wedding and, after little sleep, went to church on an empty stomach. While at church, he experienced an unusual weakness in his hands. Later that morning, he fainted. Although it was his first such episode, he

2

went to the hospital and a series of tests ensued over the next several weeks. Of particular focus is the "tilt table" test, in which the subject is strapped to a table that then tilts to an upright or steeply-angled position. The test is meant to measure the patient's heart rate and other vital signs to determine how he reacts to the change in position.

On October 10, Hoefner experienced abnormal symptoms on two different tilt table tests and was diagnosed with neurocardiogenic syncope. He underwent two more tests on October 23, and again experienced symptoms such as lightheadedness. Doctors placed him on a drug called Florinex and, on October 31, Hoefner passed the tilt table test. Nevertheless, on November 6 Hoefner was told he would "no longer be driving an orange truck" for Schneider again. Hoefner wrote the company seeking reinstatement and expressing his view that he had been wronged. In response to that letter, his former supervisor, Michael Hinz, wrote the following in January 2003:

> Dear Jerry,
>
> [. . .]First of all, thank you for your many years of service, loyalty, and safe driving. As a distinguished member of our Million Mile Club, I know how important safety is to you. For many years you have lived out the Schneider Safety Creed, "Nothing we do is worth getting hurt or hurting others".
>
> It is in this same spirit that I must communicate a very tough message. You will not be allowed to return to work, as a driver, with Schneider National, Inc. I know this must seem like a very strict and rigid decision.
>
> Jerry, we simply cannot take the risk that while driving, you would lose consciousness. This obviously would put you and the motoring public in grave danger.
>
> This decision is in keeping with Schneider's medical qualification policy and that of the Federal Motor Carriers Safety Regulations 390.1(d) and 391.41(b)(8).
>
> We do deeply respect what you have given to this company. I encourage you to review the open non-driving positions that Schneider National, Inc. can offer you and consider applying for these positions.

3

Again, thank you for your years of service.

(McBride Decl., Ex. 26.[1])

After receiving the unfavorable response to his request to return to work, Hoefner sought work elsewhere and in July 2003 began driving trucks for another company. He has since received a renewal of his medical certificate and has repeatedly been cleared to drive by doctors. In May 2003 Hoefner filed a complaint with the EEOC, and the EEOC filed this lawsuit in September 2004, alleging that Schneider terminated Hoefner based on a perceived disability in violation of the ADA.

**II. Analysis**

**1. ADA "Regarded As" Claim**

To prevail on its ADA claim, the EEOC must prove three elements: (1) Hoefner was "disabled" within the meaning of the ADA; (2) Hoefner was "qualified" to perform the job at issue; and (3) Schneider subjected him to an adverse employment action. *Nese v. Julian Nordic Constr. Co.,* 405 F.3d 638, 641 (7th Cir. 2005). Because there is no dispute that Hoefner was qualified to drive for Schneider or that his termination was an adverse employment action, the only issue in this case is whether Hoefner was "disabled" under the ADA. As to that element, an individual is deemed "disabled" under the ADA if he (a) has a physical or mental impairment that substantially limits one or more of his major life activities; (b) has a record of such an impairment; or (c) is regarded as having such an impairment. *Id.*; 42 U.S.C. § 12102(2). "If his condition does not meet one of these categories even if he was terminated because of some medical condition, he is not

---

[1] The exhibit is variously described as "attachment 26" and "deposition exhibit 22;" it appears electronically as attachment 31 to the McBride declaration.

4

disabled within the meaning of the Act. The ADA is not a general protection for medically afflicted persons." *Nese,* 405 F.3d at 641.

Narrowing the disability issue further, it is agreed that Hoefner is not actually disabled under sections (a) or (b); that is, as I noted in a previous order, one fainting episode does not substantially limit any of Hoefner's major life activities. The EEOC proceeds instead under subsection (c), claiming that Hoefner was disabled under the ADA because he was "regarded as" having a physical impairment that substantially limited a major life activity. The "regarded as" prong of the definition was meant to protect employees from discrimination on the basis of "'myths, fears and stereotypes' associated with disabilities." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489 (1999) (citing 29 C.F.R. pt. 1630 App. § 1630.2(1)). That is, the ADA protects even nondisabled individuals so long as their employer actually perceived them as being disabled.

In *Sutton,* the Supreme Court found that to be "regarded as disabled," a plaintiff must show "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." *Id.* Here, because the existence of the impairment was real, only the second part of the analysis applies: the question is whether Schneider mistakenly believed that Hoefner's neurocardiogenic syncope substantially limited one or more of his major life activities. *Id.* ("regarded as" analysis applies when employer believes "one has a substantially limiting impairment when, in fact, the impairment is not so limiting.")

Answering this question involves one final definitional step. The EEOC must show that Schneider mistakenly believed Hoefner was substantially limited in engaging in a "major life

5

activity," which the EEOC in this case defines as "working." Schneider disputes whether working is properly deemed a major life activity; but I will follow the precedent in this circuit and assume for present purposes that it is. *Kupstas v. City of Greenwood,* 398 F.3d 609, 612 (7th Cir. 2005); *Nese,* 405 F.3d at 643 ("To show that he was disabled under the ADA, Nese must show that Nordic was aware of his impairment (which it was) and that Nordic believed that he was substantially limited in a major life activity (in this case, working) because of the impairment."); *but see Sutton,* 527 U.S. at 490-93;

Synthesizing all of the above, the EEOC must show that Schneider regarded Jerome Hoefner as being substantially limited in the major life activity of working. When determining whether an employer believes an employee is substantially limited in his ability to work, courts have cited two additional considerations. First, the analysis cannot be limited only to the employer in question. In other words, the EEOC must show that Schneider believed Hoefner was unable to work for any trucking company, not just Schneider. "Section 12102(2) looks beyond the plaintiff's inability to satisfy one employer." *Nese,* 405 F.3d at 643. Second, and relatedly, the employer must believe the employee is unable to work in a broad class of jobs. Applying these factors in another case, the Seventh Circuit set forth the applicable analysis:

> [Plaintiff] first alleges that she is substantially limited in the major life activity of working. In this context, "substantially limits" means "significantly restricts the ability to perform a class of jobs or a broad range of jobs in various classes." As this Court has made explicit, however, " 'an inability to perform a particular job for a particular employer' is not sufficient to establish a substantial limitation on the ability to work; rather, 'the impairment must substantially limit employment generally.' " Thus, for Skorup to defeat Modern Door's motion for summary judgment, she must provide some evidence establishing a genuine issue of material fact over whether her condition resulted in her being substantially limited from employment generally.

6

*Skorup v. Modern Door Corp.,* 153 F.3d 512, 514-15 (7th Cir. 1998) (citations omitted). Thus, in order to show that Schneider viewed Hoefner as substantially limited in the major life activity of working, the EEOC must demonstrate that: (1) Schneider viewed Hoefner as unable to drive OTR trucks for any company, not just for Schneider, and (2) driving commercial trucks OTR is a broad class of jobs.

**2. Schneider Only Viewed Hoefner as Unable to Drive for Schneider**

Schneider first argues that it only believed Hoefner was unable to continue working as a truck driver *for Schneider*. That is, in firing Hoefner Schneider was only enforcing its own idiosyncratic syncope policy, not making a general pronouncement about Hoefner's ability to drive trucks generally. Because the ADA "looks beyond the plaintiff's inability to satisfy one employer," Schneider believes it is not liable. *Nese,* 405 F.3d at 643.

The EEOC counters that Schneider's communications to Hoefner are to the contrary. In particular, the letter from Hoefner's supervisor expressed regret that Hoefner could not continue to work for Schneider because of the risk that he would faint while driving: "Jerry, we simply cannot take the risk that while driving, you would lose consciousness. This obviously would put you and the motoring public in grave danger." (McBride Decl., Ex. 26.) In addition, the company's syncope policy was instituted in response to an earlier accident, which the EEOC believes shows that Schneider believed all syncope-diagnosed drivers were dangerous. Further, deposition testimony from Wendy Sullivan, a Schneider nurse, echoed the belief that Hoefner posed a threat to himself and the public. Because Schneider believed a syncope diagnosis was so dangerous, the argument goes, it could not have believed that Hoefner was only limited from working at Schneider–it must also have believed that Hoefner could not have driven trucks for *any* employer.

7

I conclude that the evidence supporting the EEOC's view is thin. First, some of the evidence it cites actually supports Schneider's position. The letter from Hoefner's supervisor, for instance, indicates that "*we* simply cannot take the risk . . .," which suggests the decision was simply based on Schneider's own risk tolerance rather than on any broad-based belief about Hoefner's ability to drive commercial trucks in general. The letter in fact is replete with references to Schneider's (and Hoefner's) commitment to its own safety standards. In other words, the letter from Hinz fits squarely within Schneider's position that it was merely enforcing its own policy rather than harboring a belief that Hoefner was unable to work for any OTR trucking company.

Indeed, the testimony of Sullivan is even more supportive of Schneider's position:

Q: Well, if there was just a tiny risk [of fainting] you wouldn't have cared, would you?
A: Yes I would have.
Q: So any risk is too much of a risk for you?
A: Any risk with a diagnosis of neurocardiogenic syncope, yes, is too much.

(Schneider Appendix, Ex. C, Sullivan Dep. at 89-90). In addition, she believed that other trucking companies should adopt standards similar to Schneider's, even if they had not yet done so. In her view, any minuscule risk for Schneider was "too much," and this again supports Schneider's position that its own strict standards were company-specific and not a judgment about any kind of *substantial* limitations. Schneider was simply saying it was unwilling to assume even tiny risks related to syncope, and that is apparently the category into which Hoefner fell. As his supervisor apologetically explained, "Dear Jerry, . . . I know this must seem like a very strict and rigid decision." (McBride Decl., Ex. 26.)

Indeed, the entirety of the evidence reveals that Schneider's syncope policy was Schneider-specific and not intended to represent a belief that syncope-diagnosed drivers could not drive for

8

any other trucking company. Even construing the evidence in the light most favorable to the government, all it shows is that the company thought there was *some* danger in having Hoefner drive its trucks. Of course that much is obvious, or the company would not have adopted the policy or disqualified Hoefner. But, without more, the fact that the company perceived some danger simply speaks to Schneider's corporate risk tolerance profile rather than, as the government would have it, any belief that Hoefner was *substantially* limited in his ability to work.

In that sense, then, this case resembles *Sutton,* where the Supreme Court explained:

By its terms, the ADA allows employers to prefer some physical attributes over others and to establish physical criteria. An employer runs afoul of the ADA when it makes an employment decision based on a physical or mental impairment, real or imagined, that is regarded as substantially limiting a major life activity. Accordingly, an employer is free to decide that physical characteristics or medical conditions that do not rise to the level of an impairment-such as one's height, build, or singing voice-are preferable to others, just as it is free to decide that some limiting, but not substantially limiting, impairments make individuals less than ideally suited for a job.

527 U.S. at 490-91. Here, just as United Airlines preferred pilots with 20/20 vision, Schneider is simply saying that it prefers drivers who have not had an episode of syncope; while that is a "medical condition" and a limiting impairment, there is no evidence that Schneider thought it was a "substantially limiting" one.[2] *Id.*

*E.E.O.C. v. J.B. Hunt Transport, Inc.* is also on point. 321 F.3d 69, 75 (2d Cir. 2003). There, applicants had been denied over-the-road driving positions with J.B. Hunt because of their

---

[2]Moreover, the government's characterization of the evidence makes little practical sense. Schneider only instituted its syncope policy in 2000, just two years before it disqualified Hoefner. As a long-established business employing thousands of truck drivers, it knew full well that drivers with neurocardiogenic syncope *could* drive (and drive relatively safely). One death-causing accident, however, apparently convinced Schneider that the risk was simply not worth it. If other trucking companies wanted to assume that risk, it was up to them–after all, it was a risk Schneider had borne willingly (or at least unknowingly) for its entire history until 2000.

9

use of medications with potentially harmful side effects. The court, however, found no evidence that the employer viewed the applicants as being unable to drive any trucks for *any* employer; instead, the court noted that "Hunt dismissed the applicants as unable to meet Hunt's own safety requirements-requirements above and beyond the DOT's industry-wide standards and unique from the requirements of other trucking companies." *Id.* There, as here, the company was entitled to adopt and enforce its own standards without necessarily making a judgment about whether the employee might be able to satisfy another company's driving standards. The court concluded that "there is no evidence that Hunt's reviewers, relying on Hunt's own DRL and drug lists to make a judgment on qualification for a position at Hunt, intended to make an evaluation beyond Hunt's specific guidelines. Nor is there sufficient evidence to support a finding that Hunt viewed the driving limitation as extending beyond Hunt." *Id.* at 76. The same holds true here.

The government appears to believe that it is enough to show that Schneider had a syncope policy that was medically based, and that some Schneider employees thought Hoefner posed a safety risk. The government goes a step further and argues that it "makes no sense" that Schneider would differentiate between its own safety outlook and that of other employers. (Reply Br. at 6.) If Hoefner was too dangerous to drive for Schneider, he *must* have been too dangerous to drive for anybody. But, as discussed above, the government's argument ignores the practical reality that employers are entitled to adopt differing medical standards as long as they do not violate the ADA; one employer's adoption of standards does not *ipso facto* mean that it believes all *other* employers would feel the same way–a fact evidenced in this case by the fact that Hoefner now drives for another company. Moreover, accepting the government's argument would eclipse the daylight that legions of courts have found exists between those medical disqualifications that are permissible (as

10

in *Sutton*) and those that aren't. The government must instead show that the syncope policy was based on a belief that the disqualifying medical condition is "substantially limiting," not just that it was based on a medical condition. "[I]f the condition that is the subject of the employer's belief is not substantially limiting, and the employer does not believe that it is, then there is no violation of the ADA under the 'regarded as' prong of the statute." *Mack v. Great Dane Trailers,* 308 F.3d 776, 782 (7th Cir.2002). It has not done so here.

Finally, I note that the limitation in this case bears some additional similarity to *Sutton* in that the medical condition is so benign. As Justice Ginsburg observed in a concurring opinion, the ADA in general (and perhaps especially the "regarded as" clause) was intended to combat discrimination against "a confined, and historically disadvantaged, class," not the average American with a run-of-the-mill medical condition. 527 U.S. at 495 (Ginsburg, J., concurring). In that case, however, she observed,

> persons whose uncorrected eyesight is poor, or who rely on daily medication for their well-being, can be found in every social and economic class; they do not cluster among the politically powerless, nor do they coalesce as historical victims of discrimination. In short, in no sensible way can one rank the large numbers of diverse individuals with corrected disabilities as a "discrete and insular minority."

*Id.* Thus, Justice Ginsburg concluded it would make little sense to apply the ADA to those with poor (though correctable) eyesight because they are not in any way a disadvantaged class. Similarly, to the extent the EEOC alleges Hoefner's syncope is treatable (or fully treated) with medication, the ADA would seem to offer little protection. And to the extent its claim is simply that Schneider discriminated against Hoefner because of his single fainting episode, once again it is doubtful that those countless Americans diagnosed with syncope occupy the heartland of disadvantaged classes

11

the ADA was meant to protect.³ In any event, because the evidence shows Schneider was simply enforcing its own in-house syncope policy rather than making a universal medical diagnosis about Hoefner's ability to drive a commercial truck, the government has not demonstrated that Schneider viewed him as substantially limited in his ability to work. For that reason, Schneider is entitled to summary judgment.

**3. Schneider Did Not View Hoefner as Unable to Work in a Broad Class of Jobs**

Even if Schneider did believe Hoefner could not drive OTR trucks for *any* company, that is not enough. As noted earlier, to regard Hoefner as substantially limited in his ability to work Schneider must have believed he was unable to perform in a broad class of jobs. *Sutton,* 527 U.S. at 491. Because an inability to perform only a narrow category of jobs would not constitute a *substantial* limitation in the employee's ability to work, courts have repeatedly found that such classifications of jobs do not constitute broad classes of jobs. In *Sutton,* for example, the Supreme Court found that "global airline pilot" was too narrow a category:

> Assuming without deciding that working is a major life activity . . . petitioners have failed to allege adequately that their poor eyesight is regarded as an impairment that substantially limits them in the major life activity of working. They allege only that respondent regards their poor vision as precluding them from holding positions as a "global airline pilot." Because the position of global airline pilot is a single job, this allegation does not support the claim that respondent regards petitioners as having a substantially limiting impairment. *See* 29 CFR § 1630.2(j)(3)(i) (1998) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working"). Indeed, there are a number of other positions utilizing petitioners' skills, such as regional pilot and pilot instructor to name a few, that are available to them.

*Id.* at 492-93. *See also Witter v. Delta Air Lines, Inc.,* 138 F.3d 1366, 1370 (11th Cir. 1998)

---

³It is equally doubtful, perhaps, that Congress intended the ADA to target the safety regulations of trucking companies, airlines, or other entities whose employees have the potential to inflict massive destruction and loss of life in the event of an accident.

12

(finding that piloting airplanes is not a class of jobs). Other examples abound. For instance, in *Sheehan v. City of Gloucester,* the First Circuit held:

> [A]lthough the record clearly sets forth the City's belief that Sheehan was incapable of working as a Gloucester police officer due to his hypertension and risk of heart attack, this evidence is not sufficient for Sheehan to be considered disabled. . .under the "regarded as" prong of the ADA … [because Sheehan failed to show] that the City regarded his hypertension as rendering him unable to perform a broad range of jobs.

321 F.3d 21, 25-26 (1st Cir. 2003).

If police officer and airline pilot are not broad classes of jobs, it would seem to follow that neither is the job of over-the-road truck driver. Indeed, that is what the Second Circuit held in *E.E.O.C. v. J.B. Hunt Transport, Inc., supra,* a case Schneider relies upon heavily. 321 F.3d at 75. The court affirmed the district court's grant of summary judgment to the employer on the grounds that "[d]riving freight-carrying tractor-trailer trucks over long distances for extended periods of time is neither a 'class of jobs' nor a 'broad range of jobs,' as the EEOC alleges, but rather a specific job with specific requirements." *Id.* The court reasoned:

> Such a position requires specific abilities, especially the ability to stay alert over long hours under difficult conditions. A Hunt OTR driver's alertness cannot flag. He or she must be able to stay alert and withstand the mesmerizing affect of driving an eighteen-wheel vehicle for hours at a stretch, sometimes at night, with continuous vibration over long distances. *Given these demanding requirements, the fact that one may not be able to perform the specific job of a Hunt OTR driver does not mean that one could not successfully engage in other types of truck driving, let alone in other kinds of safety-sensitive work.*

*Id.* (italics added).

Although *J. B. Hunt* is directly on point, the EEOC's position is that the case is irrelevant because the Seventh Circuit has held differently. In *Best v. Shell Oil Co.,* the court reversed a grant of summary judgment for the employer because it found "[a] reasonable trier of fact could find that

13

Best's bad knee substantially limited his ability to work as a truck driver." 107 F.3d 544, 548 (7th Cir. 1997). *Best,* however, is distinguishable for several reasons. First, the court in *Best* did not even discuss whether "truck driver" constituted a broad class of jobs. Thus, because the issue was apparently not even before the court, the EEOC's claim that *Best* is "controlling precedent" is doubtful. Second, Best drove a gas truck and had a physical limitation resulting from a knee injury. There was thus evidence from which a jury could conclude that the employer thought Best could not drive *any* trucks. That is a much broader class of work than is at issue here, where Schneider excluded Hoefner from driving OTR, a position that seems to require driving at least one-hundred thousand miles per year. *See Baulos v. Roadway Exp., Inc.,* 139 F.3d 1147, 1154 (7th Cir. 1998) ("This situation is different than in Best where the employer indicated that it did not believe that Best was capable of driving any truck."); *J. B. Hunt,* 321 F.3d at 75 ("the fact that one may not be able to perform the specific job of a Hunt OTR driver does not mean that one could not successfully engage in other types of truck driving.") Thus, even if *Best* stands for the principle that truck driving *in general* is a large enough class of jobs, there is no evidence here that Schneider believed Hoefner could not drive any truck, period. Finally, *Best* predated *Sutton*. As discussed above, the *Sutton* court found that global airline pilot was not an appropriate class of jobs, and circuit courts since then, including *J. B. Hunt,* have followed the Supreme Court's lead. Accordingly, I do not find that the law in the Seventh Circuit is settled on this point and, even if it is, the extent of *Best*'s holding is not as broad as the EEOC would have it. I agree instead with the reasoning of *J. B. Hunt* and conclude that commercial OTR driving, like global airline piloting, is not a sufficiently large class of jobs such that exclusion from the class would constitute a substantial limitation on working.

14

Because the EEOC has not shown that Schneider regarded Hoefner as substantially limited in his ability to work in a class of jobs, its ADA claim must fail for this reason as well.[4]

**4. Conclusion**

The EEOC claims that Schneider's excessive, even irrational, concern for safety led it to ignore its obligations under the ADA. Employers, such as Schneider, however, are allowed to adopt safety standards even when those standards disqualify people for medical reasons. Even if the policy is too strict, or even daft–which seems to be an unsubtle undercurrent in the EEOC's argument–the policy does not flunk the ADA unless it excludes people based on a misperception that the medical condition *substantially* limits an employee in a major life activity. That did not happen here.

The defendant's motion for summary judgment is granted, and the plaintiff's motion is denied. The case is dismissed.

**SO ORDERED** this __31st__ day of May, 2006.

                                                  s/ William C. Griesbach
                                                  William C. Griesbach
                                                  United States District Judge

---

[4]In addition, Schneider makes the argument that the proper defendant in this case is actually Schneider National Carriers, Inc. rather than Schneider National, Inc. The former company is a wholly-owned subsidiary of Schneider National, and the government argues it is a "joint employer" and therefore also liable. For the reasons given herein, however, it is not necessary to reach this question because there was no ADA violation.